IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PAUL M. PRUSKY, Individually and as | : | CIVIL ACTION |
| Trustee, Windsor Retirement Trust | | |
| v. | : | |
| PHOENIX LIFE INSURANCE CO. | : | NO.  02-6010 |

**MEMORANDUM OF DECISION**

THOMAS J. RUETER                                                                July 26, 2005
United States Magistrate Judge

Before the court for decision is an action filed by plaintiff, Paul M. Prusky,

individually as an insured and as trustee of the Windsor Retirement Trust, alleging that

defendant, Phoenix Life Insurance Company, breached the terms of a life insurance policy.[1]

Plaintiff seeks damages and equitable relief.

The parties consented to a trial before the undersigned and the late Honorable

James McGirr Kelly referred the trial to this court by Order dated September 30, 2004 (Doc. No.

90).  Trial commenced on January 18, 2005 and testimony was heard through January 21, 2005.

Each party submitted proposed findings of fact and conclusions of law.  At the request of the

parties, closing arguments were presented on March 29, 2005, after the notes of testimony were

transcribed.

In accordance with Fed. R. Civ. P. 52(a), the court makes the following:

---

[1]        At the time of trial, only Counts I (Breach of Contract) and II (Damages from
Breach of Contract) remain from plaintiff's Amended Complaint (Doc. No. 4).  Count III was
dismissed by Memorandum and Order dated March 4, 2003 (Doc. No. 10).  Summary judgment
was granted as to Counts IV, VI, and VII on August 26, 2004 (Doc. No. 80).  On October 27,
2004, plaintiff voluntarily dismissed Count V (Doc. No. 94).

## I.      FINDINGS OF FACT

### A.      Introduction

1.      The life insurance policy at issue is a Flexible Premium Survivorship Variable Universal Life Insurance Policy, No. 11172437 issued by Phoenix Home Life Mutual Insurance Company (the "Policy").  See N.T. 1/18/05, at 36; Def.'s Ex. 33.

2.      The Policy was issued to Dr. Paul Prusky ("Dr. Prusky" or "plaintiff") as trustee of the Windsor Retirement Trust.  (Def.'s Exs. 32, 33.)

3.      Dr. Prusky brought this action as trustee of the MFI Associates, Ltd. Profit Sharing Plan (the "Plan"), part of which was formerly referred to as the Windsor Retirement Trust.  (N.T. 1/18/05, at 34-36; N.T. 1/20/05, at 93.)

4.      Dr. Prusky alleges Phoenix Life Insurance Company ("Phoenix" or "defendant") has breached, and continues to breach, the terms of the Policy.

### B.      The Parties

5.      Dr. Prusky is a Pennsylvania resident and is a co-trustee of the Plan.  (N.T. 1/18/05, at 33; N.T. 1/20/05, at 93.)

6.      Dr. Prusky has worked in the investment management industry since 1970 and holds several licenses, including a Series 7 broker's license and a Series 24 financial principal's license.  (N.T. 1/18/05, at 33-34.)

7.      Dr. Prusky has purchased several variable second-to-die life insurance policies similar to the Policy as part of an estate plan pursuant to which the proceeds of the policies would be used to pay estate taxes due upon the death of Dr. Prusky and his wife, Susan M. Prusky ("Susan Prusky").  (N.T. 1/18/05, at 37, 39-40; Prusky Dep. at 54-57.)

2

8.     Windsor Securities, Inc. ("Windsor"), a corporation owned entirely by Dr. Prusky, is a registered broker-dealer and registered investment advisor which manages money on a discretionary basis.  (Prusky Dep. at 14, 16.)  Windsor assists its clients with estate planning and investing.  Id. at 20-21.  Depending on the type of account, the minimum investment amount for Windsor clients ranges from $250,000 to $1 million.  Id. at 21.  Windsor has frequently used insurance policies or annuities as vehicles to provide investment opportunities for its clients.  Id. at 18.

9.     MFI Associates, a corporation owned entirely by Dr. Prusky, is an affiliate of Windsor and also is an investment advisor.  (N.T. 1/18/05, at 34; Prusky Dep. at 14.)

10.     Phoenix is an insurance company licensed to do business in Pennsylvania.

11.     Steven Prusky ("Steven Prusky") is Dr. Prusky's son and co-trustee of the Plan.  (N.T. 1/20/05, at 91, 93.)

12.     Joseph A. Darracq ("Darracq") is a financial consultant specializing in estate planning, business planning, income tax planning and investment planning for high net-worth individuals.  (N.T. 1/19/05, at 36, 104-05.)  Darracq holds various licenses issued by the NASD and various state regulatory agencies.  (N.T. 1/19/05, at 37-38.)  Darracq is licensed to sell insurance in Pennsylvania.  (N.T. 1/19/05, at 38.)

13.     Douglas N. Winkler ("Winkler") was a Director of National Accounts for Phoenix, an entry-level position, in 1998.  (Winkler Dep. at 11-12.)  Winkler was a contact person at Phoenix for brokers and insurance agents with inquiries about Phoenix products.  (N.T. 1/21/05, at 26-28.)

14.     Michael D. Marshall ("Marshall") was Second Vice-President, Variable

3

Products Operations for Phoenix in 1998.  (N.T. 1/21/05, at 4.)  At that time, Marshall was

responsible for variable products operations, including the call center, financial processing,

policy change and the in-force service after an insurance contract was issued.  (N.T. 1/21/05, at

5.) At the time of the trial, Marshall was a Vice President of Phoenix and testified on behalf of

Phoenix.  (N.T. 1/21/05, at 24.)

15.     Paula G. Ingalls ("Ingalls") was Director of Variable Products Operations

for Phoenix, reporting to Marshall, in 1998.  (Ingalls Dep. at 20, 25.)  Ingalls shared

responsibility with another director in overseeing the day-to-day operations of the Variable

Products Operations department.  Id. at 20-21, 26, 28-29.

16.     Susan Oxley-Smith ("Oxley-Smith") was a supervisor in Phoenix's call

center in 1998, reporting directly to Ingalls and indirectly to Marshall.  (N.T. 1/21/05, at 11, 75.)

17.     James G. Hannigan ("Hannigan") was Manager of the Variable Universal

Life Customer Service Department for Phoenix in 1998 and through September 2002.  (Hannigan

Dep. at 13.)  Hannigan was responsible for the day-to-day operations, the call center, and

processing and responding to customer and agent/advisor inquiries and requests.  Id. at 14.

**C.     The Policy**

18.     The Policy insures the lives of Dr. Prusky and Susan Prusky.  (Def.'s Ex.

33.)  The Policy was purchased for estate planning purposes to be used upon the death of Dr.

Prusky and Susan Prusky to pay estate taxes.  (N.T. 1/18/05, at 37.)  The face amount of the

Policy is $10,000,000.  (Def.'s Ex. 33.)

19.     The Policy is a second-to-die policy for which the death benefit is due only

after the death of both insureds.  (N.T. 1/18/05, at 37.)

4

20.     The Policy is also a "variable universal life policy" such that premiums paid become the property of the insurance company and are placed into a separate account (the "Separate Account").  (N.T. 1/18/05, at 38; Def.'s Ex. 33.)

21.     The funds held in the Separate Account can be invested in various subaccounts (the "Subaccounts") by the owner of the Policy and can be transferred between and among the various Subaccounts.  (N.T. 1/18/05, at 38, 40; Def.'s Ex. 33.)  Each Subaccount invests in shares of a mutual fund in accordance with the investment objective of that mutual fund.  (N.T. 1/18/05, at 40.)  If the investments in the Subaccounts generate sufficient cash value to pay the costs associated with keeping the Policy in force, the Policy owner does not need to pay any additional premiums to keep the Policy in force.  (N.T. 1/18/05, at 188; Prusky Dep. at 146.)

22.     Since March and April 1999, when pursuant to Dr. Prusky's direction two premium payments totaling $169,000 were made to fund the Policy at its inception, the Policy has remained in force without the payment of additional premiums.  (N.T. 1/18/05, at 68-69; N.T. 1/20/05, at 185; N.T. 1/21/05, at 9; Prusky Dep. at 146; Def.'s Exs. 35 and 36.)

23.     In accordance with the terms of the Policy, the effective date of the Policy is February 10, 1999.  (Def.'s Ex. 33.)  Although the Policy was not finalized and delivered, and the premiums paid, until March 1999, the Policy was back-dated "to save age" such that the Policy was given a retroactive effective date to lower the cost of the insurance premium.  (N.T. 1/20/05, at 36-38, 53, 86; Def.'s Ex. 39.)

24.     The Policy contains an integration clause which specifically provides that the Policy and the application are the entire contract between the owner of the Policy and

5

Phoenix.  (Def.'s Ex. 33, Part 2, at 3.)

       25.    In order for a change in the terms of the Policy to be effective, such change must be signed by an executive officer of Phoenix and countersigned by the registrar of Phoenix or another executive officer.  (Def.'s Ex. 33, Part 2, at 3.)

       26.    The Policy reserves to Phoenix the right to limit the number of transfers the owner may make among the various Subaccounts.  (Def.'s Ex. 33, Part 5, at 12.)  The Policy provides in relevant part: "You may transfer all or a portion of this policy's value among one or more of the Subaccounts of the Separate Account and the unloaned portion of the Guaranteed Interest Account.  We reserve the right to limit the number of transfers You make, however, You can make up to six transfers per contract year from Subaccounts of the Separate Account . . . ." Id.

       27.    The cover page of the Policy contains a provision, known as the "free look period" which gives the policy owner the right to cancel the Policy within a specified time frame. See Def.'s Ex. 33.

       28.    At the time Dr. Prusky signed the application, he was aware that the Policy contained a free look period during which he could review the language of the Policy and make a decision to accept or refuse the Policy.  (N.T. 1/18/05, at 91.)

### D.    Negotiation of the Policy

       29.    Dr. Prusky asked Darracq to identify second-to-die universal life insurance policies that had the ability to trade daily among subaccounts.  (N.T. 1/18/05, at 41, 97-98; N.T. 1/19/05, at 38-42.)  In connection with this direction, Darracq contacted ten to fifteen insurance companies on behalf of Dr. Prusky.  (N.T. 1/19/05, at 46.)

30.     Darracq received commissions from the life insurance companies from which Dr. Prusky ultimately purchased policies, N.T. 1/19/05, at 108, and thus had a pecuniary interest in the completion of the purchases of insurance policies by Dr. Prusky for which Darracq acted as Dr. Prusky's agent.

31.     Dr. Prusky, through his agents, has negotiated specific terms, such as health ratings, trading rights, and fees, in connection with his various purchases of life insurance policies.  (N.T. 1/18/05, at 108.)

32.     For example, Dr. Prusky, through his agents, negotiated the terms of insurance policies with Reliastar (N.T. 1/18/05, at 55, 108-110; Def.'s Ex. 29), Prudential (N.T. 1/18/05, at 126), and Aetna (N.T. 1/18/05, at 114-15; N.T. 1/19/05, at 136-42) and obtained either written assurances of the negotiated terms or formal amendments to the policies from each of these companies.

33.     In his negotiations with John Hancock Variable Life Insurance Company ("John Hancock"), Dr. Prusky received a letter dated April 14, 1997 from the president of John Hancock which assured Dr. Prusky that John Hancock would not at any time during the life of the policy attempt to restrict his trading rights.  (N.T. 1/18/05, at 113; N.T. 1/19/05, at 144; Def.'s Ex. 27.)  John Hancock also agreed to amend a provision of its prospectus regarding transfer procedures in response to a request from Dr. Prusky.  (Prusky Dep. at 223-24.)

34.     Darracq testified that Dr. Prusky negotiated many details and described Dr. Prusky as "one of the most difficult clients in his requirements and expectations in dealing with insurance companies."  (N.T. 1/19/05, at 131-33.)

35.     Dr. Prusky is a self-described sophisticated investor.  See N.T. 1/18/05, at

65.

36.     The various second-to-die life insurance policies provide Dr. Prusky and his wife with over $100 million in coverage.  See Prusky Dep. at 54-56.

37.     Darracq sold the John Hancock policy to Dr. Prusky prior to the Phoenix Policy.  (N.T. 1/19/05, at 38-39.)

38.     Darracq initiated his inquiry of insurance companies through his brother's agency, Financial Services Corporation ("FSC").  (N.T. 1/19/05, at 46, 129.)  See Def.'s Exs. 30, 41.  FSC put Darracq in contact with Phoenix, initially Winkler.  (N.T. 1/20/05, at 80.)

39.     Darracq worked on Dr. Prusky's behalf in negotiating and obtaining the Policy.  (N.T. 1/18/05, at 98.)  From the time Dr. Prusky first expressed an interest in purchasing a Phoenix insurance policy through April 1999, Dr. Prusky did not personally speak to anyone at Phoenix and all negotiations with Phoenix were handled by his broker, Darracq.[2]  (N.T. 1/18/05, at 97.)

40.     To Dr. Prusky, the ability to make daily, unlimited trades among subaccounts was an essential feature of the life insurance policies he instructed Darracq to identify.  (N.T. 1/18/05, at 41-42, 99; N.T. 1/19/05, at 56-57; Prusky Dep. at 27-28.)

41.     Darracq understood that Dr. Prusky wanted a signed writing from Phoenix guaranteeing unlimited trading rights in the Subaccounts.  (N.T. 1/19/05, at 133, 146.)

42.     Darracq directed several questions regarding certain trading procedures to

---

[2]  The only member of Dr. Prusky's family who had direct contact with any representative of Phoenix was Steven Prusky.  Steven Prusky did not negotiate the terms of the Policy.  (N.T. 1/20/05, at 178.)  By letter dated April 6, 1999, Dr. Prusky authorized Phoenix to communicate with Steven Prusky regarding the Policy.  (N.T. 1/18/05, at 164; Pl.'s Ex. 14.)

Phoenix's marketing department.  (N.T. 1/19/05, at 47-48, 153.)  Specifically, Darracq inquired

whether Phoenix would allow unlimited transfer of funds between available Subaccounts,

whether Phoenix would accept telephone and faxed Subaccount transfer requests, whether

Phoenix would allow an authorized investment advisor to submit by telephone or fax Subaccount

transfer requests or obtain specific policy information on behalf of the policy owner, and whether

Phoenix would accept trades after 4:00 p.m. EST.  See Def.'s Ex. 16.

      43.    Winkler asked Ingalls to address Darracq's inquiries.  (Ingalls Dep. at 36-

37.)

      44.    Darracq received a memorandum dated June 10, 1998 which was

addressed to Darracq from Ingalls and which responded to Darracq's inquiries regarding trading

procedures (the "Ingalls Memorandum").  (Def.'s Ex. 16.)

      45.    In response to Darracq's first question, whether Phoenix will "allow

unlimited transfer of funds between available sub-accounts," the Ingalls Memorandum states,

"Phoenix will allow unlimited sub-account transfers."  (Def.'s Ex. 16.)

      46.    The Ingalls Memorandum was based on Ingalls' review of the Phoenix

insurance contract and prospectus and discussions with Winkler.  (Ingalls Dep. at 34.)  Ingalls did

not intend the Ingalls Memorandum to be an amendment to the insurance contract or prospectus,

but rather to reflect Phoenix's then-current policies.  Id.  After preparing the Ingalls

Memorandum, Ingalls sent a facsimile copy to Winkler.  (Ingalls Dep. at 54.)

      47.    Neither Ingalls, Winkler, nor Marshall had the authority to modify the

Policy.  (N.T. 1/21/05, at 12-14, 22.)

      48.    On or about June 15, 1998, after receiving the Ingalls Memorandum,

Darracq prepared and sent by facsimile a letter to Winkler which was addressed to Dr. Prusky. (N.T. 1/19/05, at 55-56; Def.'s Ex. 52.)  The letter was to be signed by Phoenix and purports to confirm, inter alia, that transfers among Subaccounts would not be limited in number or frequency.  (Def.'s Ex. 52.)  Darracq expected that the letter would be reviewed by Phoenix's legal department.  (N.T. 1/19/05, at 155.)

49.    In a telephone call between Dr. Prusky and Darracq on June 16, 1998, Dr. Prusky inquired as to the status of negotiations with the various insurance companies.  (Def.'s Exs. 45-b, 46-b.)  Darracq explained that he had received a "letter" from Phoenix, that he then prepared a letter for signature by Phoenix, and that he was waiting for a reply from Phoenix. (Def.'s Exs. 45-b, 46-b.)

50.    Winkler requested Ingalls to review a copy of Darracq's proposed letter and to make any necessary modifications.  (Ingalls Dep. at 61-62.)  Ingalls made several changes to the proposed letter, although she did not sign the letter on behalf of Phoenix, then sent it by facsimile to Winkler.  (Ingalls Dep. at 62-63; Pl.'s Ex. 3.)

51.    Neither Dr. Prusky nor Darracq received a signed copy of the letter Darracq prepared for signature by Phoenix.  (N.T. 1/18/05, at 139; N.T. 1/19/05, at 158.)

52.    Darracq contends that he told Dr. Prusky that he had received assurances from Phoenix about Dr. Prusky's trading rights and shortly thereafter, Darracq sent Dr. Prusky a copy of the Ingalls Memorandum.  (N.T. 1/18/05, at 45, 47, 117-18, 127.)  Dr. Prusky either never read, or did not carefully read, the Ingalls Memorandum at the time it was issued in June 1998 or at any time prior to January 2002.  See infra Findings of Fact Nos. 96-98.

53.    After receiving the Ingalls Memorandum, Darracq received a prospectus

and other marketing materials from Phoenix.  (N.T. 1/19/05, at 59-61, 116.)  See Pl.'s Ex. 35. The prospectus under which the Policy was sold to Dr. Prusky reserved to Phoenix the right to temporarily or permanently restrict trading among the Subaccounts.  See Def.'s Ex. 37.

54.     The marketing materials, referred to as the Estate Edge Fact Sheet, listed as a feature of Phoenix's Survivorship Variable Universal Life Insurance "free and unlimited [transfers] between investment subaccounts."  (Pl.'s Ex. 35 at 2.)

55.     The Estate Edge Fact Sheet states in bold type at the bottom of the second page: "**For more information about Estate Edge<sup>SM</sup>, The Phoenix Edge Series Fund and the Wanger Advisors Trust, including charges and expenses, obtain a prospectus by calling your local Phoenix office or registered representative.  Please read the prospectus carefully before you invest or send money.**"  See Pl.'s Ex. 35 at 2 (emphasis in original).

56.     Darracq believed that the language in the prospectus discussing potential restrictions on transfers was entitled to greater weight than the Estate Edge Fact Sheet.  (N.T. 1/19/05, at 127.)

57.     Although it is unclear whether Dr. Prusky read the prospectus prior to or after receiving the Ingalls Memorandum, Dr. Prusky and Darracq viewed the prospectus language restricting the right to restrict trading as language that "had to be overcome."  (N.T. 1/18/05, at 57; N.T. 1/19/05, at 116.)

58.     Darracq did not speak with a Phoenix representative regarding Dr. Prusky's trading rights from June 18, 1998 to February 16, 1999, although he did communicate with Phoenix regarding underwriting issues during that time period.  (N.T. 1/19/05, at 186.)

59.     Darracq contacted Phoenix's operations department in February 1999 in

connection with Dr. Prusky's ongoing negotiations with Phoenix and was transferred to Marshall.  (N.T. 1/19/05, at 76-77.)

   60. Darracq contends that in a conversation on February 16, 1999, during which Marshall and Darracq discussed a number of administrative issues concerning the mechanics of trading, Marshall agreed that Phoenix would honor a letter agreement granting Dr. Prusky unlimited trading rights, if the letter agreement existed.  (N.T. 1/19/05, at 80.)  Darracq's contention is not reliable.[3]

   61. Marshall did not agree to uphold the Ingalls Memorandum during the February 16, 1999 conversation with Darracq and would not have had the authority to make such a promise.  (N.T. 1/21/05, at 18, 49.)  Marshall also informed Darracq that neither he nor Ingalls would have had the authority to issue a writing that would modify the terms of the Policy.  (N.T. 1/21/05, at 17-18.)

   62. In a letter to Dr. Prusky dated February 17, 1999, Darracq discussed his conversation with Marshall, but did not indicate that he discussed the Ingalls Memorandum or any writing which guarantees unlimited trading rights.  See Def.'s Ex. 19; Pl.'s Ex. 27.

   63. Darracq and Dr. Prusky also had a lengthy conversation on February 17,

---

 [3]  Darracq's testimony at trial was, at best, ambiguous at times.  For example, Darracq testified that he faxed the Ingalls Memorandum to Marshall, but then indicated that it was "probably" the Ingalls Memorandum that he faxed.  See N.T. 1/19/05, at 80, 82.  In addition, Darracq's testimony was confusing in that he seemed unable to distinguish between the Ingalls Memorandum and the letter he prepared for signature by Phoenix (Def.'s Ex. 52) which would have confirmed unlimited trading rights.  See, e.g., N.T. 1/19/05, at 161-62, 192, 197-98.  Moreover, Darracq's assertions were unreasonable at times.  For example, Darracq testified that he assumed, without any apparent basis, that the letter he prepared for signature by Phoenix which confirmed unlimited trading rights (Def.'s Ex. 52) was signed by Phoenix and sent to Dr. Prusky.  See N.T. 1/19/05, at 163-66.

1999 and discussed the letter Darracq had sent to Dr. Prusky that same day.  (Def.'s Ex. 45-d, 46-d.)  In this conversation, Darracq described to Dr. Prusky his conversation with Marshall, but Darracq did not tell Dr. Prusky that Marshall was unaware of a letter regarding Dr. Prusky's trading rights.  (N.T. 1/19/05, at 196; Def.'s Exs. 45-d, 46-d.)  Darracq also did not tell Dr. Prusky that Marshall agreed to uphold the Ingalls Memorandum.  (Def.'s Exs. 45-d; 46-d.)

64.     Darracq contends that he sent a facsimile to Marshall on February 17, 1999.  See Pl.'s Ex. 13.  Darracq's testimony is inconsistent as to what, if anything, he sent to Marshall.  See N.T. 1/19/05, at 79-82, 192-93, 197; N.T. 1/20/05, at 63.  Marshall does not recall receiving a facsimile from Darracq on February 17, 1999.  (N.T. 1/21/05, at 37, 52.)

65.     Darracq testified that he then had a follow up telephone conversation with Marshall on or about February 18, 1999.  (N.T. 1/20/05, at 62-63.)

66.     Although he was aware that a memorandum regarding trading rights allegedly existed, Marshall saw the Ingalls Memorandum for the first time in January 2002.  (N.T. 1/21/05, at 45, 79.)

67.     Darracq testified that he spoke with Oxley-Smith on a number of occasions regarding operational issues, including a conversation on February 17, 1999.  (N.T. 1/19/05, at 94-97, 187.)  Darracq testified that during their conversation on February 17, 1999, he informed Oxley-Smith that Marshall had indicated Phoenix would uphold the letter granting unlimited trading rights; however, Oxley-Smith did not promise Darracq that Phoenix would uphold the Ingalls Memorandum or a letter guaranteeing Dr. Prusky unlimited trading rights.  (N.T. 1/19/05, at 94-96, 189-92.)

E.      **Application for and Acceptance of the Policy**

68.      Initially, Dr. Prusky completed a California insurance application form in error, but subsequently completed a proper, Pennsylvania application form for the Policy.  (N.T. 1/18/05, at 59; 1/19/05, at 72-73.)

69.      Dr. Prusky signed the Policy application form on February 17, 1999.  (N.T. 1/18/05, at 64; Def.'s Ex. 32.)

70.      Darracq's brother, Dal Darracq, who was licensed through Phoenix, is listed as the producer of record on the application.  (N.T. 1/18/05, at 91; N.T. 1/19/05, at 89; N.T. 1/21/05, at 34-35; Def.'s Ex. 32 at 5.)  Despite the fact that Dal Darracq certified that Dr. Prusky executed the application in his presence, Dr. Prusky did not execute the application in Dal Darracq's presence.  (N.T. 1/18/05, at 91.)

71.      Although Dal Darracq is listed as the producer of record on the policy application, Joseph Darracq worked on behalf of Dr. Prusky and handled all of Dr. Prusky's negotiations with Phoenix.  (N.T. 1/18/05, at 97-98.)  Joseph Darracq thus acted as the producer for purposes of negotiating and obtaining the Policy.[4]

72.      The application which Dr. Prusky signed states: "I understand that i) no statement made to, or information acquired by any producer who takes this application, shall bind the company unless stated in Part I and/or Part II of this application; ii) the producer has no authority to make, modify, alter or discharge any contract hereby applied for and; iii) the insurance applied for shall not take effect until the issuance of a contract and payment of the

_____

[4]  By letter dated April 6, 1999 to Phoenix, Dr. Prusky appointed Joseph Darracq as a limited attorney-in-fact for purposes of receiving information and administering matters regarding the Policy.  See Def.'s Ex. 49.

issue premium due."  (Def.'s Ex. 32 at 5.)

73.     Neither Part I nor Part II of the application list the Ingalls Memorandum or any other guarantee of unlimited trading rights.  See Def.'s Ex. 32.

74.     Because the statements guaranteeing unlimited trading rights which Darracq alleges were made to him were not listed in Parts I or II of the application, such statements did not become part of the application and, therefore, did not bind Phoenix.

75.     In executing the application, Dr. Prusky verified that the statements made in the application were true and complete.  See Def.'s Ex. 32 at 5.

76.     The Policy was delivered to Dr. Prusky in March 1999 and Dr. Prusky signed a one page Policy Acceptance Form on March 23, 1999 acknowledging receipt of the Policy.  (N.T. 1/18/05, at 64-65; Def.'s Exs. 33, 34.)

77.     By executing the Policy Acceptance Form, Dr. Prusky again declared that the statements in the application remain full, complete, and true as of March 23, 1999.  (Def.'s Ex. 34.)

78.     The Policy Acceptance Form contains a section where amendments to the Policy are to be listed.  See Def.'s Ex. 34.  The only amendment listed pertains to Susan Prusky's medical treatment.  Id.

79.     Dr. Prusky testified that when he received the Policy, he believed that the Policy, along with the Ingalls Memorandum, granted him the right to make unlimited Subaccount transfers.  (N.T. 1/18/05, at 98-99.)  Dr. Prusky's belief was not reasonable under the circumstances.

80.     In March 1999, Dr. Prusky wanted confirmation from Darracq that their

15

presumption that Dr. Prusky had the right to make unlimited trades among the Subaccounts was

correct.  See N.T. 1/18/05, at 170, 176.  Dr. Prusky testified that at that time he wanted

"reinforcement."  (N.T. 1/18/05, at 170.)

  81. Dr. Prusky knew that the Policy would provide for a free look period,

during which time he could review the language of the Policy and decide either to accept or reject

the Policy.  (N.T. 1/18/05, at 91.)  Under the terms of the free look period, Dr. Prusky could

cancel the Policy within twenty days after the Policy was delivered to him.  See Def.'s Ex. 33.

  82. Dr. Prusky read the Policy during the free look period.  (N.T. 1/18/05, at

99, 101.)  During this time, however, neither Dr. Prusky nor anyone on his behalf[5] contacted

Phoenix to inquire why the Ingalls Memorandum was not included in the Policy.  (N.T. 1/21/05,

at 10.)

  83. In a conversation on March 26, 1999, during the free look period, Dr.

Prusky informed Darracq that he needed "those confirming letters before the 10 day look period

is over."  (Def.'s Exs. 45-f, 46-f.)  Dr. Prusky also stated that "if those people at Phoenix don't

turn out to be cooperative that policy is D-E-D [sic]."  Id.  Darracq indicated that he had to call

"them" and promised to "get something faxed" to Dr. Prusky.  Id.

  84. The March 26, 1999 conversation between Dr. Prusky and Darracq

illustrates that both Darracq and Dr. Prusky sought to confirm Dr. Prusky's right to make

unlimited trades so that Dr. Prusky could decide whether to accept or reject the Policy.

_____

 [5] Darracq did not review the Policy.  (N.T. 1/19/05, at 122-23.)  Darracq believed Dr.
Prusky had a right to conduct unlimited trades that was contradictory to the prospectus, but did
not verify the provisions of the Policy regarding transfers among Subaccounts.  (N.T. 1/19/05, at
123-24.)

85.     Sometime in March 1999, Darracq sent additional materials to Dr. Prusky and included a cover letter in which Darracq indicated that Phoenix should have received Dr. Prusky's application package and further stated: "Enclosed is material requested plus my phone transcripts pertaining to issues.  I think you [sic] butt is covered, using me."  (N.T. 1/18/05, at 166-68; N.T. 1/19/05, at 100-01; Def.'s Ex. 21.)

86.     In addition, Dr. Prusky also received from Darracq a letter dated March 28, 1999 which included Darracq's reconstructed history of phone calls and conversations pertaining to Dr. Prusky's concerns with the Policy.  (N.T. 1/18/05, at 169; N.T. 1/20/05, at 11; Def.'s Exs. 3, 18.)  Dr. Prusky testified: "As a sophisticated investor, I thought . . . [Darracq's March 28, 1999 letter] was sufficient evidence to tell me that I had what I needed."  (N.T. 1/18/05, at 65.)

87.     On or about April 1, 1999, Darracq also prepared a phone log which reflected his recollection of conversations between February 1999 and November 1999.  (N.T. 1/19/05, at 174-81; N.T. 1/20/05, at 73-75; Def.'s Ex. 15.)

88.     Darracq's history of conversations and correspondence set forth in the phone log (Def.'s Ex. 15) and his March 28, 1999 letter (Def.'s Exs. 3, 18) are not complete nor fully credible.  The March 28, 1999 letter does not list all of the conversations which Darracq had with Dr. Prusky or Phoenix regarding the Policy and Dr. Prusky's issues.  See, e.g., N.T. 1/18/05, at 159, 173-74; N.T. 1/20/99, at 161-62; Def.'s Exs. 45-a, 46-a, 45-b, 46-b.  In addition, certain of the discussions listed in the March 28, 1999 letter, e.g., the June 13, 1998 and June 18, 1998 conversations, are not corroborated by a tape recording even though all calls in and out of Windsor were recorded during that time period.  Moreover, the March 28, 1999 letter does not

list the June 15, 1998 letter drafted by Darracq for signature by Phoenix guaranteeing unlimited trading rights.  (Def.'s Exs. 20, 52.)

89.     On or about March 25, 1999, Steven Prusky executed a check dated March 25, 1999 to Phoenix Home Life Mutual Insurance Company for $28,000 as payment of the first premium.  (N.T. 1/18/05, at 87; N.T. 1/20/05, at 185-86; Def.'s Ex. 35.)

90.     On or about April 6, 1999, Dr. Prusky paid an additional $141,000 to Phoenix.  (N.T. 1/18/05, at 88; Def.'s Ex. 36.)  Dr. Prusky determined the amount of the second payment based upon what was appropriate in connection with his investment strategy.  (N.T. 1/18/05, at 61-62, 90.)

91.     On April 14, 1999, Steven Prusky spoke with Oxley-Smith regarding the procedures for faxing trades to Phoenix.  (Def.'s Exs. 45-h, 46-h.)  Oxley-Smith did not waive any rights or modify the Policy in any way during this conversation.

92.     Shortly after the free look period expired, Dr. Prusky began trading among the Subaccounts.  (N.T. 1/18/05, at 73.)

93.     For over three years, until July 15, 2002, Phoenix did not restrict Dr. Prusky's transfers among the various Subaccounts.

**F.     Exercise of Rights under the Policy**

94.     In January 2002, Phoenix determined that it was going to restrict what it deemed excessive transfers among Subaccounts and began notifying policyholders that it had identified excessive traders.  (N.T. 1/21/05, at 55, 88; Pl.'s Ex. 22.)

95.     On or about January 17, 2002, Phoenix notified Dr. Prusky that it intended to restrict the number of transfers that could be made under the Policy.  (N.T. 1/18/05, at 73;

18

Def.'s Exs. 45-i, 46-i.)

96.     On January 17, 2002, Steven Prusky called Darracq and explained that
Phoenix intended to limit the number of transfers among the Subaccounts.  (Def.'s Exs. 45-i, 46-i.)  Dr. Prusky joined the call and expressed an interest in having the matter resolved then, rather than waiting to see if Phoenix would, in fact, limit the number of transfers as suggested by Darracq.  Id.

97.     During the call, Dr. Prusky reviewed a copy of the Ingalls Memorandum and commented: "Oh, I didn't see this Joseph.  Why didn't you tell me about this?" and read to Darracq and Steven Prusky a portion of the memorandum.  (Def.'s Exs. 45-i, 46-i.)  After Dr. Prusky expressed his dissatisfaction with the language of the Ingalls Memorandum, Steven Prusky noted: "Dad, everything you saw . . . C'mon now, you saw this."  Id.  Dr. Prusky replied: "I didn't read it.  Apparently I didn't read this.  Certainly I didn't read it carefully.  I wouldn't have gone if I . . . I think I was assured by some insurance salesman in California that everything was okay."  Id.

98.     Thus, although Dr. Prusky testified that Darracq had received assurances from Phoenix that were satisfactory to him regarding unlimited trading rights and that Darracq had sent Dr. Prusky a copy of the Ingalls Memorandum shortly after June 10, 1998, see N.T. 1/18/05, at 45, 47, 117-18 and 127, Dr. Prusky's comments during the January 17, 2002 telephone conversation demonstrate that Dr. Prusky either never read, or did not carefully read, the Ingalls Memorandum at the time it was issued in June 1998 or at any time prior to January 2002.

99.     In a telephone conversation on January 18, 2002, Steven Prusky expressed

19

concern to Marshall about Phoenix's intention to limit transfers among the Subaccounts (the "January 18 Conversation"). See Def.'s Exs. 45-j, 46-j. Steven Prusky indicated that the Pruskys had received a letter from Paula Ingalls assuring them that there would be no restrictions on Subaccount transfers. (Def.'s Exs. 45-j, 46-j.) Steven Prusky pointed out to Marshall that in a prior instance in which an insurance company attempted to limit trades, "we had to go to court [and] we won." Id. Steven Prusky suggested that Marshall review the file and noted that he was "always happy to try to work with people before things get out of hand and feelings get turned the wrong way." Id. Marshall stated that he would like to see a copy of the letter that Steven Prusky referenced, indicated that Paula Ingalls was not authorized to make such an exception to the insurance contract, and asserted that the language of the insurance contract and the prospectus governed the situation. Id.

100. With regard to the timing of the implementation of the restrictions on trades, in the January 18 Conversation, Marshall conveyed Phoenix's intention to ultimately exercise its right to limit the number of transfers among the Subaccounts. Marshall stated, "ultimately we're not going to allow this trading activity to occur . . . and that's where we're going." (Def.'s Exs. 45-j, 46-j.) Marshall explained the reasoning for the trading restrictions: "It's just that the trading activity is just causing us problems and within our guidelines, we're gonna be basically restricting them." Id. When asked by Steven Prusky what the time frame was for implementing the restrictions, Marshall responded that the implementation "started with our phone call yesterday" to Dr. Prusky and further noted, "I'm not rejecting whatever trade you did yesterday but we're working to bring this to closure." Id. Marshall clarified that the phone call was "a courtesy heads up. That's what it was intended to be." Id. Marshall told Steven Prusky

that Phoenix would notify Dr. Prusky before the limitations on trading were actually implemented.  Id.  Specifically, Marshall indicated that he would "absolutely pick up the phone and talk to" Steven Prusky before the trading restrictions were implemented.  Id.

101.    Marshall perceived Steven Prusky's comments during the January 18 Conversation as threatening litigation.  (N.T. 1/21/05, at 20.)  As a result, after the conversation with Steven Prusky, Marshall notified Phoenix's legal department.  (N.T. 1/21/05, at 20.)

102.    Between January 2002 and July 2002, because of Steven Prusky's threats of litigation, Phoenix reviewed the files and determined how to impose the restrictions on transfers among Subaccounts.  See N.T. 1/21/05, at 20.

103.    In July 2002, Phoenix implemented the transfer restrictions.  (N.T. 1/21/05, at 20, 88.)

104.    Marshall did not call Steven Prusky, or anyone else on Dr. Prusky's behalf, to notify Dr. Prusky that Phoenix was implementing the transfer restrictions.  (N.T. 1/21/05, at 87-88.)

105.    Instead, by letter dated July 9, 2002 signed by Hannigan, Phoenix notified Dr. Prusky that it intended to actively monitor the activities in accounts with excessive trading and reserved the right to cancel or reject any trade (the "Hannigan Letter").  (Pl.'s Ex. 10.)

106.    By deferring its implementation of the trading restriction until July 2002, Phoenix did not intend to waive its rights under the Policy.  Phoenix's telephone call to Dr. Prusky in January 2002 was to notify Dr. Prusky that Phoenix would restrict trades "going forward."  (N.T. 1/21/05, at 88.)

107.    After receiving the Hannigan Letter, on July 11, 2002, Dr. Prusky called

21

Darracq.  (Def.'s Exs. 45-k, 46-k.)  During this conversation, Dr. Prusky told Darracq that he had

a conversation with Hannigan, but that Hannigan "doesn't know anybody.  He doesn't know

anything.  He'll take it up with legal."  Id.  When told of Hannigan's title at Phoenix, Darracq

described Hannigan as a "low dick" to which Dr. Prusky replied, "Yeah, sure.  But so is Laura

Ingalls," in apparent reference to Paula Ingalls.  See id.  This conversation demonstrates that Dr.

Prusky did not believe that Ingalls was a person of authority at Phoenix.

      108.    Even after Phoenix began limiting the number of trades among the

Subaccounts in July 2002, Dr. Prusky continued to fax to Phoenix, and continues to fax to

Phoenix, on an almost daily basis, instructions concerning the desired transfers.  Thus, Dr.

Prusky has maintained records of the actual trades processed by Phoenix and those trades which

were faxed, but rejected because they exceed the limits under the prospectus and Policy.  See

N.T. 1/20/05, at 117-27; Pl.'s Exs. 29, 30.

      109.    Based on the evidence of record, including this court's assessment that the

testimony of Dr. Prusky and Darracq is not wholly credible, this court concludes that Dr. Prusky

did not reasonably believe that the Ingalls Memorandum and any purported assurance that

Darracq received from Marshall or any Phoenix employee concerning unlimited trading rights

were part of the Policy.

      Having made the above Findings of Fact, the court makes the following:

## II.    CONCLUSIONS OF LAW

      This court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332.

A federal court sitting in diversity must apply the conflict of law rules of the forum state.  Klaxon

v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 496 (1941).  Under Pennsylvania's choice of law

principles, an action arising from an insurance policy is governed by the law of the state in which the policy was delivered.  CAT Internet Servs., Inc. v. Provident Washington Ins. Co., 333 F.3d 138, 141 (3d Cir. 2003).  The Policy was delivered in Pennsylvania and neither party disputes that Pennsylvania law applies.

### A.    Contract Interpretation and Parol Evidence

At issue in the present case are the terms of the Policy between the parties.  The Policy reserves to Phoenix the right to limit the number of transfers among Subaccounts.  (Def.'s Ex. 33, Part 5, at 12.)  Plaintiff contends that Phoenix breached the terms of the Policy when, in July 2002, Phoenix limited the number of transfers among Subaccounts.

The Pennsylvania Superior Court recently explained a Pennsylvania court's role in contract interpretation as follows:

> In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement.  When construing agreements involving clear and unambiguous terms, this Court need only examine the writing itself to give effect to the parties' understanding.  This Court must construe the contract only as written and may not modify the plain meaning under the guise of interpretation.

Currid v. Meeting House Rest. Inc., 869 A.2d 516, 519 (Pa. Super. Ct. 2005) (citing Abbott v. Schnader, Harrison, Segal & Lewis, 805 A.2d 547, 553 (Pa. Super. Ct. 2002), appeal denied, 827 A.2d 1200 (Pa. 2003)).

As a preliminary matter, in presenting the breach of contract claim, plaintiff has proffered evidence of various oral and/or written statements made by Phoenix employees regarding the subject matter of the Policy.  Generally, the parol evidence rule prohibits consideration of prior oral or written representations involving the same subject matter as the

contract.  The parol evidence rule provides:

> Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement. All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract . . . and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence.  Gianni v. Russell & Co., 281 Pa. 320, 126 A. 791, 792 (1924) (citations omitted); see also Scott v. Bryn Mawr Arms, Inc., 454 Pa. 304, 312 A.2d 592, 594 (1973).  Therefore, for the parol evidence rule to apply, there must be a writing that represents the "entire contract between the parties."  Gianni, 126 A. at 792.  To determine whether or not a writing is the parties' entire contract, the writing must be looked at and "if it appears to be a contract complete within itself, couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the [parties'] engagement, it is conclusively presumed that [the writing represents] the whole engagement of the parties. . . ."  Id.

Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 436 (Pa. 2004).

However, parol evidence "may be introduced to vary a writing meant to be the parties' entire contract where a party avers that a term was omitted from the contract because of fraud, accident, or mistake."  Yocca, 854 A.2d at 437.  While parol evidence may be introduced based on a party's claim that there was fraud in the execution of a contract, it may not be admitted based on a claim that there was fraud in the inducement of a contract.  Id. at 437 n. 26. To prove fraud in the execution, a plaintiff must prove that the parties agreed that certain terms would be included in the written contract, and that the terms were omitted by fraud, accident or mistake.  1726 Cherry St. P'ship v. Bell Atl. Prop., Inc., 653 A.2d 663, 666 (Pa. Super. Ct. 1995). In other words, a plaintiff must have thought that the document he signed contained the disputed terms.  Id.  Parol evidence can be admitted to show that, by reason of a mutual mistake, a written instrument does not truly express the intention of the parties.  General Elec. Credit Corp. v.

Aetna Cas. & Sur. Co., 263 A.2d 448, 456 (Pa. 1970.)   Parol evidence is also admissible to clarify an ambiguity.  Yocca, 854 A.2d at 437.  "[W]here a term in the parties' contract is ambiguous, 'parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances.'"  Id. (citing Estate of Herr, 400 Pa. 90, 161 A.2d 32, 34 (1960)).

In the present case, the parol evidence rule bars statements made prior to February 10, 1999[6] from being considered part of the Policy.  The Policy, by its own terms, is integrated and excludes any statement or promises other than those set forth in the application and the Policy from being part of the Policy.[7]  See Def.'s Ex. 33.  The Policy further provides that

---

[6]  The Policy specifies an effective date of February 10, 1999.  See Def.'s Ex. 33.  Thus, the February 10, 1999 date is relevant for evaluation of the evidence in connection with the parol evidence rule.  See Mutual Life Ins. Co. of New York v. Hurni Packing Co., 263 U.S. 167, 175-76 (1923) ("It was competent for the parties to agree that the effective date of the policy should be one prior to its actual execution or issue; and this, in our opinion, is what they did.  Plainly their agreement was effective to govern the amount of the premiums and the time of their future payment, reducing the former and shortening the latter, and, in the absence of words evincing a contrary intent, we are unable to avoid the conclusion that it was likewise effective in respect of other provisions of the policy, including the one here in question."); Potts v. Metro. Life Ins. Co., 2 A.2d 870, 874 (Pa. Super. Ct. 1938) ("Companies issuing insurance policies, as in other contracts, have the right to fix in the policy the date of its beginning, and this date, . . . may be prior to, at the time of, or subsequent to its delivery.").  See also Gov't Employees Ins. Co. v. Benton, 859 F.2d 1147, 1153 (3d Cir. 1988) (in construing the date of issuance of the policy, the court cited to Hurni and Potts and concluded the most reliable record evidence of the policy's effective date was defined by the policy itself).

[7]  The Policy contains an integration clause.  See Def.'s Ex. 33.  An integration clause which provides that the writing represents the parties' entire agreement is "a clear sign that the writing is meant to be just that and thereby expresses all of the parties' negotiations, conversations, and agreements made prior to its execution."  Yocca, 854 A.2d at 437.  Once the writing is determined to be the parties' entire contract, the parol evidence rule applies "and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract."  Id.

amendments are effective only if in writing and signed by an executive officer of Phoenix and countersigned by an executive officer or Phoenix's registrar.  See id.  In addition, although parol evidence is admissible to clarify an ambiguity, the Policy simply is not ambiguous.[8]

Furthermore, plaintiff has not proven that any of the exceptions to the parol evidence rule apply.  Plaintiff has not proven that the Policy failed to contain a provision guaranteeing unlimited Subaccount transfers due to fraud,[9] accident, or mistake.  The evidence does not support a finding that, due to fraud in the execution, Dr. Prusky thought that the Policy contained a provision guaranteeing unlimited Subaccount transfers.  Dr. Prusky testified that he read the Policy during the free look period and further insisted to Darracq that he needed "confirming letters."  See supra Findings of Fact Nos. 82-83.  In addition, there is no evidence that Phoenix omitted from the Policy a provision guaranteeing unlimited trading among the Subaccounts due to mistake.  That is, plaintiff presented no credible evidence that anyone at Phoenix ever intended that the Policy would contain a provision guaranteeing that Phoenix would not act in the future to limit the number of trades among Subaccounts.

Consequently, the court will not consider evidence of communications between the parties before February 10, 1999 for purposes of altering the terms of the Policy.[10]

_____

[8]  Contractual language is ambiguous if it is reasonably susceptible to different constructions and capable of being understood in more than one sense.  Madison Constr. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999) (citations and internal quotations omitted).

[9]  This court granted summary judgment in favor of Phoenix on plaintiff's fraudulent inducement claim prior to trial.  See Order dated August 26, 2004 (Doc. No. 80.)

[10]  The court will, however, consider the evidence admitted at trial for purposes of applying the reasonable expectations doctrine.  See Section B infra.

### B.  Reasonable Expectations Doctrine

Notwithstanding the language of the integrated contract, plaintiff argues that the court should apply the reasonable expectations doctrine to enforce plaintiff's expectation that Phoenix would never limit the number of transfers among Subaccounts.[11]

In UPMC Health Sys. v. Metro. Life Ins. Co., 391 F.3d 497 (3d Cir. 2004), the United States Court of Appeals for the Third Circuit applied the Pennsylvania reasonable expectations doctrine.  The "doctrine of reasonable expectations states that, '[t]he reasonable expectations of the insured is the focal point of the insurance transaction . . . regardless of the ambiguity, or lack thereof, inherent in a given set of documents.'"  UPMC, 391 F.3d at 502 (quoting Collister v. Nationwide Life Ins. Co., 479 Pa. 579, 388 A.2d 1346, 1353 (1978)).  The doctrine is intended to protect against the danger that an insurer will agree to certain coverage when receiving the insured's application and then unilaterally change those terms when it later issues a policy.  Id.  See also Thomas J. Rueter & Joshua H. Roberts, Pennsylvania's Reasonable

---

[11]  Defendant contends that the reasonable expectations doctrine is inapplicable to the case at bar because the purpose of the doctrine is to protect non-commercial insureds from deception, and Windsor Retirement Trust, the owner of the Policy, is a commercial insured. Defendant further contends that although Dr. Prusky also brought this action in his individual capacity, and even if Windsor Retirement Trust were deemed to be an alter-ego of Dr. Prusky, Dr. Prusky is such a sophisticated party that it would be inequitable to apply the doctrine.  As recognized by the Superior Court of Pennsylvania, the highest court in Pennsylvania has applied the reasonable expectations doctrine only in narrow circumstances: (1) to protect non-commercial insureds from policy terms which are not readily apparent; and (2) to protect non-commercial insureds from deception by insurance agents.  Matcon Diamond v. Pennsylvania Nat'l Ins. Co., 815 A.2d 1109, 1114 (Pa. Super. Ct. 2003) (citing Madison, 735 A.2d at 109 n.8). Mindful of the recent decision by the United States Court of Appeals for the Third Circuit in UPMC Health Sys. v. Metro. Life Ins. Co., 391 F.3d 497 (3d Cir. 2004), in which the court applied the reasonable expectations doctrine in a case in which the insured was a nonprofit corporation, this court will apply the doctrine to the case at bar.

Expectations Doctrine: The Third Circuit's Perspective, 45 Vill. L. Rev. 581, 581-93 (2000)

(discussing purpose of doctrine).

      In most cases, the language of the insurance policy provides the best indication of

the parties' reasonable expectations. Med. Protective Co. v. Watkins, 198 F.3d 100, 106 (3d Cir.

1999) (internal citations and quotations omitted). However, a court must examine the totality of

the insurance transaction at issue to ascertain the reasonable expectations of an insured

individual. Id. (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 903 (3d Cir.1997)). See also

Tonkovic v. State Farm Mut. Auto. Ins. Co., 521 A.2d 920, 926 (Pa. 1987) ("Courts must

examine the dynamics of the insurance transaction to ascertain what are the reasonable

expectations of the consumer.").

      The doctrine applies where the insured reasonably expected certain coverage,

"even when those expectations were in direct conflict with the unambiguous terms of the policy."

UPMC, 391 F.3d at 502.[12]  In UPMC, the Third Circuit reversed the decision of the district court

because the district court had refused to apply the reasonable expectations doctrine. The Third

Circuit noted that the district court erred in finding that, because the terms of the policy were

---

    [12]  The Third Circuit recently reiterated that the reasonable expectations doctrine applies regardless of the ambiguity, or lack thereof, in a given set of documents. In Tran v. Metro. Life Ins. Co., the Third Circuit held that the district court had erred in granting summary judgment against an insured because a reasonable jury could find that the insured justifiably relied on the insurance agent's representations about the nature of the policy. 408 F.3d 130 (3d Cir. 2005). In reversing in part the district court's grant of summary judgment, the Third Circuit found that, given the ambiguous policy language, the insurance company's representation and the insured's limited understanding of the English language, an issue of fact existed as to the insured's justifiable reliance. Id. at 139. In so holding, the Third Circuit noted that a reasonable jury could find that the insured's reasonable expectations prevailed even if those expectations contradicted unambiguous policy language. Id. at 139 n.11 (citing UPMC Health Sys. v. Metro. Life. Ins. Co., 391 F.3d 497, 502 (3d Cir. 2004)).

clear and unambiguous, as was the policy's integration clause, parol evidence could not be considered in determining the reasonable expectations of the parties.  Id. at 503.

The Third Circuit also concluded that the district court had improperly found that the reasonable expectations doctrine was inapplicable because the insured, UPMC, was a sophisticated party and the policy was entered into by parties of equal status.  Id. at 503-04. Instead, the Third Circuit has predicted that Pennsylvania courts would apply the reasonable expectations doctrine even where the insured is a sophisticated purchaser of insurance.  Id. at 503.  However, "[s]tatus as a sophisticated purchaser is a 'factor to be considered when resolving whether the insured acted reasonably in expecting a given claim to be covered,' but does not automatically disqualify it."  Id. (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 906 (3d Cir.1997)).

In the present case, because plaintiff's stated expectation is in conflict with the, albeit unambiguous, terms of the Policy, the court will apply the reasonable expectations doctrine.  In doing so, this court must consider whether plaintiff's expectation that Phoenix would never limit the number of transfers among Subaccounts was reasonable.  The court concludes that, contrary to plaintiff's assertion, such expectation is not reasonable.

The evidence of record reveals that it was not reasonable for Dr. Prusky to expect that the Policy guaranteed him unlimited trades among the Subaccounts for the life of the Policy. Specifically, Dr. Prusky's claim of reliance on the representations in the Ingalls Memorandum is not credible and is undermined by the evidence of record.  Although he testified that he had received the Ingalls Memorandum in June 1998 (N.T. 1/18/05, at 45, 47, 117-18, 127), Dr. Prusky's comments in a recorded telephone conversation demonstrate that he either did not read,

29

or did not read carefully, the Ingalls Memorandum prior to January 2002, <u>see</u> Def.'s Ex. 45-i, 46-i.  A document that Dr. Prusky read in January 2002 cannot be the basis for his "reasonable expectations" of what the Policy granted him at its effective date in February 1999.  Moreover, Dr. Prusky clearly felt that the Ingalls Memorandum did not sufficiently guarantee the trading rights that he desired.  In a telephone conversation with Darracq that was recorded during the free look period, Dr. Prusky demanded "confirming letters" or the Phoenix policy was "D-E-D."  <u>See</u> Def.'s Exs. 45-f, 46-f.  Darracq even prepared a letter for signature by Phoenix in an attempt to receive further assurances that Phoenix would not limit the number of trades among Subaccounts.  <u>See</u> Def.'s Ex. 52.  Dr. Prusky knew that Darracq had sent this letter to Phoenix for signature.  <u>See</u> Def.'s Exs. 45-b, 46-b.  However, Phoenix never returned a signed writing to Dr. Prusky or Darracq, and each was aware that Phoenix had not provided such a writing.  (N.T. 1/18/05, at 164; N.T. 1/19/05, at 79.)  In addition, Dr. Prusky was aware that he had an opportunity during the free look period to review the Policy and reject it if he so chose.  (N.T. 1/18/05, at 91.)  Dr. Prusky read the Policy during the free look period, (N.T. 1/18/05, at 101), but did not reject it.

Moreover, Dr. Prusky's status as a sophisticated investor must be considered with regard to the reasonableness of his expectation.  Dr. Prusky was a sophisticated investor and negotiator who had negotiated high-value second-to-die universal life insurance policies with a number of other insurance companies.  The evidence reveals that neither Darracq nor Dr. Prusky believed that the Ingalls Memorandum sufficiently guaranteed the rights Dr. Prusky sought, particularly in light of the documented assurances Dr. Prusky had received during negotiations with other insurance companies.  <u>See</u> <u>supra</u> Findings of Fact Nos. 32-34.  Moreover, when

30

Darracq described Hannigan as a "low dick" and Dr. Prusky responded that Paula Ingalls was one

as well, Dr. Prusky demonstrated that he did not believe Ingalls was a person of authority.  See

Def.'s Exs. 45-k, 46-k.  It was therefore unreasonable for Dr. Prusky to expect that Phoenix had

amended the Policy via an unsigned memorandum from Paula Ingalls given that the Policy

requires a signature by an executive officer of Phoenix, and a countersignature by an executive

officer or Phoenix registrar, in order for an amendment to be effective.  Indeed, as noted supra in

Finding of Fact No. 33, in connection with the purchase of another life insurance policy from

John Hancock, Dr. Prusky obtained a letter from the president of the company which assured Dr.

Prusky that John Hancock would not restrict his trading rights.  In addition, contrary to plaintiff's

assertion that the marketing materials reiterated the representations in the Ingalls Memorandum,

Darracq testified that he knew the language in the prospectus discussing potential restrictions on

transfers was entitled to greater weight than the language of the Estate Edge Fact Sheet.  (N.T.

1/19/05, at 127.)

Plaintiff's contention that he expected to be able to execute unlimited transfers

among the Subaccounts for the life of the Policy because Phoenix employees had agreed to

modify the Policy also is not reasonable.  Contrary to plaintiff's assertion, Phoenix employees

did not promise to uphold the terms of the Ingalls Memorandum as an amendment to the Policy.

In contrast, prior to the expiration of the free look period and the payment of any premiums by

plaintiff, Mike Marshall told Darracq on February 16, 1999 that neither he nor Paula Ingalls was

authorized to issue a writing that modified the terms of the Policy.[13]

---

[13]  As noted supra in Findings of Fact Nos. 39 and 71, at all times relevant to the present
case, Darracq acted as agent or producer on behalf of Dr. Prusky.  Therefore, Darracq's
understanding of the terms of the Policy is imputed to Dr. Prusky.  Furman Lumber, Inc. v. The

Based on the foregoing, the court thus finds that plaintiff did not have a reasonable expectation that he could make unlimited trades among the Subaccounts or that Phoenix had agreed to alter the Policy terms that reserved the right to limit Subaccount transfers.

### C.    No Waiver, Estoppel, Modification

Plaintiff also claims that Phoenix's post-contractual statements and conduct should be considered in determining whether Phoenix waived its right to limit the number of transfers among Subaccounts or whether Phoenix modified the Policy to permit unlimited transfers among Subaccounts.  Plaintiff has asserted a variety of legal theories, including waiver, modification and equitable estoppel in support of this claim.  The court finds that Phoenix did not relinquish its right to limit the number of transfers among Subaccounts.

### 1.    Waiver

Under Pennsylvania law, a waiver is an intentional relinquishment or abandonment of a known right, claim or privilege.  Brown v. City of Pittsburgh, 186 A.2d 399, 401 (Pa. 1962).  "To constitute a waiver of legal right, there must be a clear, unequivocal and decisive act of the party with knowledge of such right and an evident purpose to surrender it."  Id. (citations omitted).  See also Samuel J. Marranca Gen. Contracting Co., Inc. v. Amerimar Cherry, 610 A.2d 499, 501 (Pa. Super. Ct. 1992) ("Waiver is a voluntary and intentional

---

Mountbatten Sur. Co., Inc., 1997 WL 539685, at *13 (E.D. Pa. Aug. 6, 1997).  Furthermore, to the extent that Dr. Prusky's expectations were based on incorrect or incomplete information provided to him by Darracq, Phoenix cannot be held responsible for Darracq's omissions or misrepresentations.  See Fisher v. Aetna Life Ins. & Annuity Co., 39 F. Supp. 2d 508, 514-15 (M.D. Pa. 1998) (insurance broker who sold insurer's life insurance policy to insured was an agent for the insured and, therefore, any misrepresentations that the broker made to the insured could not be imputed to the insurer), aff'd, 176 F.3d 472 (3d Cir.), cert. denied, 528 U.S. 816 (1999).

abandonment or relinquishment of a known right.") (citation omitted); <u>Argonaut Great Cent. Ins. Co. v. Phil's Tavern, Inc.</u>, 2001 WL 1346327, at *3 (E.D. Pa. Oct. 29, 2001) (in order to establish waiver by an insurer, the evidence must show that acts of the insurance company constituted a voluntary, intentional relinquishment of a known right and the insurer had full knowledge of all pertinent facts).

       A waiver may be express or implied.  "Waiver may be established by a party's express declaration or by a party's undisputed acts or language so inconsistent with a purpose to stand on the contract provisions as to leave no opportunity for a reasonable inference to the contrary."  <u>Marranca</u>, 610 A.2d at 501.  <u>See also</u> <u>Moscatiello Const. Co. v. Pittsburgh Water and Sewer Auth.</u>, 648 A.2d 1249, 1251 (Pa. Commw. Ct. 1994) (same).  Implied waiver applies only in circumstances equivalent to an estoppel, <u>i.e.,</u> the person claiming the waiver must show that he was mislead and prejudiced thereby.  <u>Brown</u>, 186 A.2d at 401.

       In the present case, no conduct by Phoenix amounted to an express waiver of its right to limit the number of transfers among Subaccounts.  Phoenix did not, by declaration or action, expressly waive its right to limit the number of Subaccount transfers.

       In addition, Phoenix did not impliedly waive its right to limit the number of Subaccount transfers.  Although Phoenix did not begin restricting the number of plaintiff's transfers among Subaccounts until July 2002, such delay in exercising its right does not constitute a waiver of the right.  The Policy expressly reserves to Phoenix the right to limit the number of Subaccount transfers and does not specify a time period during which such right must be exercised.  <u>See</u> Def.'s Ex. 33, Part 5, at 12.  Rather, the reservation of rights was discretionary and could be exercised at any time during the life of the Policy.

33

Furthermore, Phoenix's decision to defer implementation of the transfer restrictions from January 2002 until July 2002 did not manifest an intent to waive its right to limit the number of Subaccount transfers.  In January 2002, Phoenix notified plaintiff that it intended to ultimately exercise its right to limit the number of trades among the Subaccounts and that it would restrict transfers "going forward."  Between January 2002 and July 2002, because of Steven Prusky's threats of litigation, Phoenix determined how to impose the restrictions on transfers.  By deferring its implementation of the trading restriction until July 2002, Phoenix did not waive its rights under the Policy, but rather worked internally to implement the transfer restrictions.

### 2.	Modification

Plaintiff also contends that Phoenix modified the terms of the Policy by its post-contractual conduct and granted plaintiff the right to make unlimited Subaccount transfers.  The parties' course of performance can be relevant to determining the meaning of the contract in dispute.  J.W.S. Delavau, Inc. v. E. Am. Transp. & Warehousing, Inc., 810 A.2d 672, 684 n.3 (Pa. Super. Ct. 2002) (citing Atlantic Richfield Co. v. Razumic, 480 Pa. 366, 376 n.6 (Pa. 1978)). See also Langer v. Monarch Life Ins. Co., 879 F.2d 75, 81 (3d Cir. 1989) (citing Pennsylvania Eng'g Corp. v. McGraw-Edison Co., 459 A.2d 329, 332 (Pa. 1983), for the proposition that the parties' course of performance is relevant in interpreting a writing).

Here, the Policy provides that, to be effective, an amendment must be a signed writing.  See Def.'s Ex. 33.  Pennsylvania courts, nevertheless, have allowed modification of a written agreement, even with a no-oral modifications clause, by subsequent parol negotiation or action of the parties.  See, e.g., Wagner v. Graziano Constr. Co., 136 A.2d 82, 84 (Pa. 1957)

34

(finding the parties to a contract could, by subsequent oral agreement, legally covenant to waive a specific stipulation in the contract). Such an "oral waiver or modification of a written contract must be proved by clear, precise and convincing evidence, including conduct by the parties that 'clearly shows the intent to waive the requirement that the amendments be made in writing.'" MDNet, Inc. v. Pharmacia Corp., 2005 WL 1385906, at *4 (3d Cir. June 13, 2005) (not precedential) (citing Somerset Comm. Hosp. v. Allan Mitchell & Assocs., 685 A.2d 141, 146 (Pa. Super. Ct. 1996)).

   In the present case, Phoenix's post-contractual conduct does not demonstrate that it intended to waive the requirement that amendments be made in writing. Although Phoenix permitted frequent transfers among the Subaccounts until July 2002, Phoenix advised plaintiff during the negotiation of the Policy and again in January 2002, that Paula Ingalls did not have the authority to vary the terms of the Policy. See N.T. 1/21/05, at 17-18; Def.'s Exs. 45-j, 46-j. In addition, Phoenix notified plaintiff in January 2002 that it would limit the number of transfers going forward. The fact that Phoenix permitted frequent transfers among Subaccounts until July 2002 does not constitute clear evidence that Phoenix would never exercise its right to limit the number of transfers, or that it had modified the Policy to guarantee that it would never limit the number of transfers. Phoenix's course of performance instead demonstrates that it simply did not exercise its right to limit the number of Subaccount transfers until July 2002.

   Moreover, "once a contract has been formed, its terms may be modified only if both parties agree to the modification and the modification is founded upon valid consideration." J.W.S. Delavau, Inc. v. E. Am. Transp. & Warehousing, Inc., 810 A.2d 672, 681 (Pa. Super. Ct. 2002) (citing Corson v. Corson's Inc., 434 A.2d 1269 (Pa. Super. Ct. 1981)). See also Kreutzer

v. Monterey County Herald Co., 747 A.2d 358, 362 (Pa. 2000) (an oral or written contract may be modified by a subsequent agreement which is supported by legally sufficient consideration and meets the indicia of contract formation).  Here, plaintiff did not provide additional consideration to Phoenix for the alleged grant of the right to perform unlimited Subaccount transfers for the life of the Policy.

For the foregoing reasons, the court finds that there was no valid modification of the Policy.

### 3.      Equitable Estoppel

The court has already dismissed plaintiff's equitable estoppel claim.  Count III of plaintiff's Amended Complaint  (Equitable Estoppel) was dismissed by Memorandum and Order dated March 4, 2003 (Doc. No. 10).  To the extent that plaintiff continues to argue equitable estoppel as a basis for recovery, such a claim has no merit.[14]

Equitable estoppel is a doctrine that "recognizes that an informal promise implied by one's words, deeds or representations which leads another to rely justifiably thereon to his own injury or detriment may be enforced in equity."  Kreutzer, 747 A.2d at 361 (citing Novelty Knitting Mills v. Siskind, 457 A.2d 502, 503 (Pa. 1983)).  In addition, "under the estoppel concept, a contract may be modified if either words or actions of one party to the contract induce another party to the contract to act in derogation of that contract, and the other justifiably relies

---

[14]  Furthermore, as discussed in the court's March 4, 2003 Memorandum and Order, neither Pennsylvania law nor the United States Court of Appeals for the Third Circuit recognizes equitable estoppel as a separate cause of action, although it has been recognized as an affirmative defense.  See Carlson v. Arnot-Ogden Mem. Hosp., 918 F.2d 411, 416 (3d Cir. 1990); Graham v. Pennsylvania State Police, 634 A.2d 849, 852 (Pa. Commw. Ct. 1993).  See also Liebman v. Prudential Fin., Inc., 2002 WL 31928443, at *3 (E.D. Pa. Dec. 30, 2002) (concluding that equitable estoppel is not available as a separate cause of action under Pennsylvania law).

upon the words or deeds of the first party." Id. at 362.[15]

Plaintiff argues that in January 2002 Dr. Prusky asserted his right to make unlimited transfers among Subaccounts and because Phoenix did not limit such transfers until July 2002, Phoenix should be estopped to contest plaintiff's right to unlimited Subaccount transfers.

The record does not support plaintiff's claim that Phoenix's actions from January 2002 until July 2002 induced plaintiff to believe that plaintiff had the right to make unlimited transfers among Subaccounts. In the January 18 Conversation, Phoenix reiterated that Paula Ingalls did not have the authority to make an exception to the standard form insurance policy. After Steven Prusky expressed concern to Marshall about Phoenix's intention to limit transfers among the Subaccounts, Marshall indicated that Paula Ingalls was not authorized to make such an exception to the insurance contract and asserted that the language of the insurance contract and the prospectus governed the situation.

Furthermore, the record does not support a finding that plaintiff justifiably relied upon Phoenix's words and actions in derogation of the Policy. In the January 18 Conversation, Marshall notified plaintiff that Phoenix was in the process of limiting the number of transfers among Subaccounts. Marshall conveyed Phoenix's intention to "ultimately" exercise its right to

---

[15] In Kreutzer, the Pennsylvania Supreme Court analyzed whether "estoppel of any kind," i.e., promissory estoppel or equitable estoppel, was applicable to written contracts which allow either party to terminate the contract at will. 747 A.2d at 362. The court noted that the appropriate theory for examination was equitable estoppel, rather than promissory estoppel, because the matter relied upon to create an estoppel was conduct, not a promise. Id. at 361-62. The court ultimately concluded that estoppel did not apply to modify the term of the written agreement because the record did not support the plaintiffs' claim that they were induced to rely on acts or words in derogation of the written provisions of the contract. Id. at 362.

limit the number of transfers among Subaccounts.  When asked by Steven Prusky about the time frame for implementing the restrictions, Marshall responded that the implementation "started with our phone call yesterday" to Dr. Prusky.  Marshall clarified that the phone call was "a courtesy heads up."  Thus, Marshall clearly expressed to plaintiff that Phoenix was in the process of implementing the Subaccount transfer restrictions.  It is, therefore, not reasonable for plaintiff to claim that because Phoenix did not immediately reject the transfers, Phoenix thereby acquiesced in plaintiff's claimed right to unlimited transfers.

Therefore, even if plaintiff's claim of equitable estoppel previously had not been dismissed, estoppel does not apply to modify the terms of the Policy.  The record does not support plaintiff's claim that Phoenix should be estopped to contest plaintiff's right to unlimited Subaccount transfers.

**D.    Breach of Contract**

Plaintiff has failed to meet his burden of proving by a preponderance of the evidence that Phoenix breached the terms of the Policy.  See Snyder v. Gravell, 666 A.2d 341, 343 (Pa. Super. Ct. 1995) (noting generally that the party having the burden of proof in a breach of contract matter must sustain it by a preponderance of the evidence).

The elements for a claim of breach of contract under Pennsylvania law are: (1) the existence of a contract; (2) a breach of a duty imposed by the contract; and (3) damages.  Sullivan v. Chartwell Inv. Partners, L.P., 873 A.2d 710, 716 (Pa. Super. Ct. 2005) (citing J.F. Walker Co., Inc. v. Excalibur Oil Group, Inc., 792 A.2d 1269 (Pa. Super. Ct.  2002)).  Plaintiff has not established that Phoenix breached a duty imposed by the Policy.  The language of the Policy is clear and unambiguous.  The Policy reserves to Phoenix the right to limit the number of transfers

among Subaccounts.  (Def.'s Ex. 33, Part 5, at 12.)

Giving effect to the unambiguous language of the Policy, see supra Finding of Fact No. 26 and discussion at 23-25, Phoenix did not breach the Policy when it exercised its right to limit the number of transfers among the Subaccounts.  See Altimari v. John Hancock Variable Life Ins. Co., 247 F. Supp. 2d 637, 644 (E.D. Pa. 2003) ("[W]hen policy language is clear and unambiguous, the court must give effect to the language of the contract. . . .  Also, the words of the insurance policy must be construed in their natural, plain,  and ordinary sense.") (citing Riccio v. Amer. Republic Ins. Co., 550 Pa. 254, 705 A.2d 422, 426 (1997)).

For all the above reasons, judgment will be entered in favor of defendant and against plaintiff on all remaining claims.


BY THE COURT:


_____
THOMAS J. RUETER
United States Magistrate Judge

39